IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BENJAMIN DAWSON,

    Petitioner,

  v.

KELLY HARRINGTON, WARDEN

    Respondent.
                                           /

No. C 09-783 SI

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is denied.

## BACKGROUND

The California Court of Appeal summarized the facts of this case as follows:

> On May 12, 2003, Officer Brian Huynh of the South San Francisco Police Department saw a car that he believed was exceeding the speed limit. He followed the car to verify that it was speeding, and after a short distance, the driver of the car—[petitioner]—pulled over to the curb and stopped. [Petitioner] and his female passenger both got out of the car, and the woman walked away. Huynh told [petitioner] to get back in the car, and asked for his identification. [Petitioner] told Huynh that his identification was in the back of the car, which was cluttered with various objects, and he gave Huynh the name and birthdate of his stepbrother, Francisco Pena, instead of his own. [Petitioner] testified that he did this because although both men were on parole, [petitioner] was subject to an arrest warrant for a parole violation, but Pena was not. [Petitioner] volunteered to Huynh that he was on parole, which Huynh understood to mean that [petitioner] was under a court order requiring him to submit to being searched on request by any police officer.
>
> Huynh told [petitioner] he was going to give him a warning for speeding. Under local procedure, this required Huynh to fill out a written citation. [Petitioner], who was being polite and cooperative with Huynh to this point, told Huynh that he was suffering from diarrhea and badly needed to use a restroom. [Petitioner] explained at trial that he

did not in fact need to use the restroom, but was trying to get Huynh to give him an opportunity to dispose of the gun he had in his pocket.[1]

Huynh escorted [petitioner] into a nearby restaurant to use the restroom. As he did so, another South San Francisco police officer, Michael Toscano, arrived to back up Huynh, since he had heard over his radio that Huynh had stopped a parolee for a traffic violation. Toscano followed Huynh and [petitioner] into the restaurant.

When the three men arrived at the restroom, Huynh used his foot to stop [petitioner] from closing the restroom door, and stood in the doorway so that he could watch [petitioner] while he was inside. For Huynh's benefit, [petitioner] successfully pretended that he had genuinely needed to use the restroom, and he continued to be cooperative with Huynh during the time they were in the restaurant. [Petitioner] testified that Huynh's insistence on keeping him under observation while in the restroom prevented him from disposing of the gun there.

After the officers and [petitioner] left the restaurant, Toscano went to turn off the engine of Huynh's police car, at Huynh's request. While Toscano was about 20 feet away accomplishing this task, [petitioner] asked Huynh to let him go, but Huynh explained he still had to give [petitioner] a citation, and also told him that since he was on parole, Huynh wanted to search him for weapons. According to Huynh, [petitioner] then began to act strangely. Huynh expected him to return to his car, but instead he walked in a different direction. As Toscano was returning from locking Huynh's car, [petitioner] began backing away from Huynh with his hands up, and then turned and ran. [Petitioner] testified at trial that he ran away in order to try to dispose of the gun where the police would not see him do so, or could not recover it, so that he could avoid getting caught with it in his possession. He knew that if he were caught with a gun, it would mean he would go back to prison.

Huynh chased [petitioner], and Toscano lost sight of them and ran in another direction to try to cut [petitioner] off. Huynh caught up with [petitioner] and grabbed his shirt, but [petitioner] struck Huynh with his elbow, causing Huynh to let go, and continued running. When Huynh caught up with [petitioner] again, [petitioner] knocked Huynh down, injuring him slightly. By this time, Toscano had arrived in a position from which he could see the two men, and he continued to come closer to them. During the ensuing events, Toscano, Huynh, and [petitioner] moved around, but were always positioned so as to form three points of a triangle.

While Huynh was on the ground, both he and Toscano saw [petitioner] put his hand deep into his pants pocket, which [petitioner] had not done before during their encounter, and Huynh became concerned that [petitioner] was reaching for a weapon. As Huynh pushed himself away, [petitioner] drew out a .380-caliber Beretta pistol and aimed it directly at Huynh from eight to ten feet away.

Huynh and Toscano were both carrying .40-caliber guns of the model issued to all members of their police department. When [petitioner] drew his gun, Huynh quickly got up, drew his own weapon, and ran toward some parked cars so as to put them between him and [petitioner's] gun. Meanwhile, Toscano stopped running towards the other two men, drew his own gun, and yelled, "Gun. Drop the gun." [Petitioner] was

---

[1] "[Petitioner] testified that he and his wife, who was the passenger in his car, were moving out of their rented apartment that day, and that he had run across the gun while packing his clothes for the move, and stuck it in his pocket so as not to leave it behind, without even knowing whether or not it was loaded." [footnote in appellate decision].

2

turning his body so that his gun pointed alternately at Huynh and Toscano. [Petitioner's] testimony was that he was not aiming at the officers, but was just turning his body because he was looking for an escape route, and needed to know where they were.

[Petitioner] ran in another direction. As [petitioner] was running away, Huynh heard a "pop" sound, but could not tell whether or not it was a gunshot. Toscano testified that he fired his own gun just before [petitioner] ran, because he thought [petitioner] was going to shoot Huynh. Toscano testified at trial that he remembered firing at least one shot at this point, but was "pretty sure" he fired a second shot very close to the first one.

Huynh chased after [petitioner], and Toscano fired his gun again, which was either the second or third time he fired. Toscano testified that he could not tell whether or not [petitioner] had fired his own gun up to that point; his own first shot was the first one he heard. Both officers continued to chase [petitioner], and [petitioner] continued to point his gun back at each of them alternately.

When [petitioner] stopped and crouched behind a car with his gun pointed at Huynh, Toscano fired his gun a third time. After this, Toscano heard more than one "pop" sound. The "pops" sounded to Toscano like gunshots, but were not coming from his gun. He did not know who fired them, however. Toscano did not hear any shots after that.

[Petitioner] then ran around a corner. When Huynh rounded the corner, he saw [petitioner], and told him to drop his gun. Instead, [petitioner] brought his gun up and pointed it at Huynh. Huynh then shot at [petitioner], wounding him in the arm and side, and causing him to fall to the ground and drop his gun.

After [petitioner] fell, Huynh went over to him, pointed his gun at him, and kicked [petitioner]'s gun out of his reach. The gun was still in one piece when Huynh and Toscano arrived, although it was starting to come apart, but when Huynh kicked it, it broke apart into two pieces. Meanwhile, Toscano put [petitioner] in handcuffs, and the officers summoned medical assistance for [petitioner's] gunshot wounds.

Huynh testified at trial that he thought he had only fired his own gun once during the incident, but the forensic evidence showed he had actually fired twice. Toscano only remembered firing two or three times, but acknowledged that he had since learned that he had fired as many as four times. In fact, the forensic evidence showed that Toscano had fired four times. Toscano testified that if he fired four times, the fourth shot was fired at about the same time and from about the same location as the third one.

[Petitioner] testified that he did not fire his gun at any time during the encounter. He was unable to explain why a bullet from his gun was found at the scene. Huynh never actually saw [petitioner] fire his gun, and did not actually recall, even right after the incident, whether or not [petitioner] had done so, although he thought he had. He only remembered hearing two shots: the "pop" sound, and the sound of his own gun firing once. Toscano did not see either [petitioner] or Huynh fire their guns. Neither Huynh nor Toscano ever saw [petitioner] do anything that led them to believe [petitioner] was trying to toss away his gun, however.

A surveillance camera at a gas station near the scene recorded [petitioner's] encounter with Huynh and Toscano. The resulting video was played for the jury at [petitioner's] trial. The confrontation between [petitioner] and the officers was not visible on the video, but the gunshots were audible.

> Edward Normandy, a South San Francisco Police Department officer who served as the department's armorer and firearms instructor, testified as an expert witness for the prosecution regarding the gunshot sounds heard on the tape. He opined that the audio recording reflected the sound of seven distinct gunshots, of which the first four, and the last two, originated from the .40-caliber weapons used as a standard duty weapons by officers of the South San Francisco Police Department.

Respondent's Ex. F at 1-7 (*People v. Dawson*, No. A109625, Cal. Ct. App. Aug. 15, 2007).

On June 15, 2004, a jury found petitioner Benjamin Dawson guilty of attempted murder, two counts of assault on a peace officer, possession of methamphetamine for sale and being a convicted felon in possession of a firearm. On March 11, 2005, the trial court sentenced petitioner to 92 years to life in state prison. Petitioner appealed his conviction to the California Court of Appeal, which issued an unpublished opinion affirming the lower court on August 15, 2007. On the same date and in a separate order, the California Court of Appeal summarily denied petitioner's petition for a writ of habeas corpus. Petitioner also filed a petition for writ of habeas corpus in the California Supreme Court, and on November 28, 2007, the California Supreme Court summarily denied the petition.

## LEGAL STANDARD

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

4

state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**DISCUSSION**

Petitioner challenges his conviction and sentence on three grounds: (1) petitioner's due process rights were violated when the prosecution failed to produce evidence that may have impeached prosecution witness Sergeant John Haggett ("Haggett"); (2) the trial court violated petitioner's constitutional rights by failing to instruct the jury on the defense of accident or misfortune; and (3) trial counsel's failure to investigate Haggett's history of police misconduct and failure to obtain an expert witness who could challenge the prosecution's expert testimony amounted to ineffective assistance of counsel.[2]

**I.   Failure to produce impeachment evidence regarding SFPD Officer Haggett**

The prosecution presented evidence that less than two weeks prior to the events of May 12, 2003, petitioner assaulted and injured San Francisco police officer John Haggett in an attempt to escape after allegedly committing two traffic violations. According to the California Court of Appeal's decision:

> Haggett testified that he blocked [petitioner's] car with his own to prevent him from leaving the cul-de-sac into which he followed [petitioner], and that [petitioner] then intentionally drove his car directly at Haggett's police cruiser, striking the door of the cruiser and pinning Haggett's foot between the car door and the frame. This evidence was offered for the purpose of showing that when [petitioner] fired his gun during his encounter with Huynh and Toscano, he did so with the motive and intent to kill them.

---

[2] Petitioner's traverse only addresses the second claim that the trial court violated his rights by failing to instruct on the defense of accident or misfortune, and thus it is unclear whether petitioner has abandoned the first and third claims. Nevertheless, because the petition asserts all three claims, the Court addresses all three claims in this decision.

5

Respondent's Ex. F at 10. At trial, Haggett testified that after petitioner pinned his foot between the car door and frame, petitioner escaped, and Haggett was stuck in the vehicle until the fire department arrived at the scene to pry the door and free Haggett. RT 2378-79. Haggett was treated at San Francisco General Hospital for his injuries. *Id*. The prosecution also played a tape recording of Haggett's encounter with petitioner. RT 2383-86.

Petitioner contends that the prosecution violated his due process rights by failing to produce certain evidence that would have impeached Officer Haggett. Prior to trial, petitioner's trial counsel filed a motion pursuant to *Pitchess v. Superior Court*, 11 Cal.3d 531 (1974), requesting that the prosecution produce all records maintained by the San Francisco Police Department and/or San Francisco Office of Citizen Complaints regarding complaints, disciplinary action, and allegations of misconduct against Officer Haggett. In response, the prosecution produced two citizen complaints filed in 1998 and ten citizen complaints filed between 2000 and 2003. Petitioner contends that the prosecution violated his due process rights as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to produce or disclose (1) minutes from 1988 Police Commission hearings that resulted in Haggett being suspended for 90 days; (2) Police Commission records that showed Haggett was suspended for 90 days for a second time in November 1988; (3) a 1989 police brutality suit against Haggett based on 56 citizen complaints; (4) the fact that Haggett had been sued civilly six times with combined damage awards totaling $235,000; and (5) a complaint filed by an attorney who in 1995 allegedly witnessed Haggett "fatally shoot an unarmed man while he was surrounded by police and had nowhere to run." Pet. Attach. A at 2-4.

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. The prosecution has a duty to produce impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 437 U.S. 667, 676 (1985).

Respondent contends that there was no *Brady* violation because, *inter alia*, petitioner has not shown that there was any prejudice as a result of the prosecution's failure to produce the undisclosed evidence. The Court agrees. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that

6

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Here, petitioner does not assert that Haggett's testimony was false. As the California Court of Appeal noted, in addressing a different claim on appeal,[3] "In his own testimony, appellant acknowledged that the incident with Haggett had occurred, and that he was '[t]rying to get away' from Haggett. He denied intending to hit Haggett with his car, however, contending that he was simply trying to drive out of the cul-de-sc via the only available route when he ran into Haggett's car door, and that he was not aware he had injured Haggett when he drove away." Respondent's Ex. F at 10-11. Thus, because petitioner admitted that the incident with Haggett had occurred, any impeachment value of the evidence at issue is minimal at best. Moreover, the prosecution produced numerous citizen complaints against Haggett to petitioner, and petitioner has not identified any new basis for impeachment that would have been provided by the undisclosed evidence. *See Schad v. Ryan*, 606 F.3d. 1022, 1037 (9th Cir. 2010) (en banc) (holding there was no *Brady* violation "where the undisclosed evidence related to the same motives to lie as evidence already known to and utilized by the defense" and "the circumstantial evidence demonstrating Schad's guilt was powerful, and Schad did not offer any significant evidence to rebut the strong inference of guilt arising from that evidence.").

## II.     Failure to instruct on the defense of accident or misfortune

Petitioner claims that the trial court violated his constitutional rights by failing to instruct the jury on the defense of accident or misfortune. California Penal Code Section 26 sets forth the defense of accident or misfortune, which precludes criminal conviction of "Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." Cal. Pen. Code § 26.

The California Court of Appeal rejected petitioner's claim that the trial court erred in refusing to instruct the jury on the defense of accident or misfortune. The court determined as a matter of state law that there was insufficient evidence in the record to warrant an accident instruction:

---

[3] In his direct criminal appeal, petitioner contended that Haggett's testimony was erroneously admitted.

7

>First, a trial court is required to give requested instructions on a defense to a criminal charge only if the defense is supported by substantial evidence in the record. (*People v. Williams*, 4 Cal.4th 354, 361 (1992); *People v. Rodriguez*, 53 Cal. App. 4th 1250, 1269-1270 (1997).). [Petitioner] relies on *People v. Gonzales*, 74 Cal. App. 4th 382 (1999) for the proposition that the accident instruction was required here. In that case, a victim of domestic violence told relatives, and testified at the preliminary hearing, that her injuries came from the defendant hitting her accidentally with a door when opening it. The court held that the evidence of these statements constituted substantial evidence that defendant's conduct was accidental, thus requiring the trial court to give the accident instruction sua sponte. (*Id.* at 389-390).
>
>In the present case, however, [petitioner] cites no equivalent evidence supporting a theory of accidental injury. [Petitioner's] trial counsel *argued* that the gun must have gone off accidentally, but [petitioner] did not so testify. Rather, he testified repeatedly and unequivocally that he had never fired the gun, or, for that matter, pointed it at Huynh or Toscano, and disclaimed any knowledge of how a bullet from the gun came to be found in the vicinity of his arrest. In our view, given [petitioner's] explicit and unequivocal denial that he had fired the gun, there was not sufficient evidence of an accidental discharge to require the accident instruction.
>
>Second, even if we were to assume, for the sake of argument, that the jury could infer an accidental discharge from the evidence in this case, we would still find no reversible error in the failure to give the accident instruction. The jury was expressly instructed that in order to return a true finding on the enhancement for deliberate discharge of a weapon, it had to find that [petitioner] intentionally fired his gun. The jury then returned a true finding on that enhancement on count three (assault on Huynh). This verdict demonstrates that the jury simply did not believe [petitioner's] version of the events, and found that he had fired his gun on purpose.[4] Given this finding, it is clear from the jury's verdict that they would not have accepted [petitioner's] accidental discharge theory even if the accident instruction had been given.

Respondent's Ex. F at 17-19.

Under California law, a defendant is entitled to a jury instruction only if substantial evidence, or "evidence sufficient to deserve consideration by the jury," supports the giving of that instruction. *People v. Barton*, 12 Cal.4th 186, 201 & n.8 (1995) (internal quotation marks omitted). The trial court's determination that the accident or misfortune instruction was not appropriate, and the state appellate court's affirmance of that decision resulted from interpretation of state law. "Any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis

---

[4] "[T]he jury acquitted [petitioner] of attempted murder of Toscano (count two), and although it found him guilty of assaulting Toscano (count four), it found not true the intentional use of a firearm enhancement on that count. Contrary to [petitioner's] argument, the latter finding is not in the least inconsistent with the conclusion that even if the accident instruction had been given, the verdict would have been the same. Taken together, the verdicts clearly indicate that the jury concluded that [petitioner] aimed his gun at both officers, and that he fired it intentionally, but only once, and only at Huynh. There findings are amply supported by the evidence, and [petitioner] does not argue otherwise." [footnote in appellate decision].

8

for federal habeas relief." *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).

Petitioner contends that the failure to give the accident or misfortune instruction constituted a violation of due process. A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir.1988). A habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Steward*, 111 F.3d 616, 624 (9th Cir.1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.* A defendant is entitled to an instruction on his defense theory only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotations omitted).

Petitioner argues that there was evidence to support a defense of accident or misfortune because, *inter alia*, a defense expert testified that petitioner's firearm could have discharged accidentally either when Officer Huynh shot petitioner in the arm of the hand that held the firearm, or when petitioner dropped the weapon on the ground while the safety was off. Petitioner contends that without the instruction on accident or misfortune, if the jury believed that petitioner fired the gun accidentally, the jury was "compelled nonetheless to find that petitioner intentionally fired his gun because it was given no alternative." Traverse at 7:28-8:1. However, as the California Court of Appeal held in rejecting this contention, the "jury was expressly instructed that in order to return a true finding on the enhancement for deliberate discharge of a weapon, it had to find that [petitioner] intentionally fired his gun. The jury then returned a true finding on that enhancement on count three (assault on Huynh). This verdict demonstrates that the jury simply did not believe appellant's version of the events, and found that he had fired his gun on purpose." Respondent's Ex. F at 18.

Petitioner asserts that his theory "reconciles the jury's contrary findings as to Huynh and Toscano." Traverse at 8:4-5. However, as the California Court of Appeal noted,

> [T]he jury acquitted appellant of attempted murder of Toscano (count two), and although it found him guilty of assaulting Toscano (count four), it found not true the intentional use of a firearm enhancement on that count. Contrary to appellant's argument, the latter

9

> finding is not in the least inconsistent with the conclusion that even if the accident instruction had been given, the verdict would have been the same. Taken together, the verdicts clearly indicate that the jury concluded that appellant aimed his gun at both officers, and that he fired it intentionally, but only once, and only at Huynh. These findings are amply supported by the evidence, and appellant does not argue otherwise.

Respondent's Ex. F at 18 n.11.

Petitioner has not shown that the absence of the accident instruction had a "substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). As the state court held, the jury specifically found that petitioner intentionally fired his weapon, and thus even if the accident or misfortune instruction has been given, the verdict would have been the same.

### III.    Ineffective assistance of counsel

Petitioner contends that he received ineffective assistance of counsel when his defense counsel (1) failed to investigate Haggett's history of police misconduct and (2) failed to obtain an expert witness who could challenge the testimony of the prosecution's ballistics expert.

The Sixth Amendment right to counsel guarantees effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* A habeas petitioner must establish two things to prevail on a Sixth Amendment ineffectiveness claim: (1) the counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687-88; and (2) that he was prejudiced by counsel's deficient performance, ie., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. As to the first prong, the relevant inquiry is not what the defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbit v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689.

### 1.     Failure to investigate

Petitioner contends that defense counsel ineffectively failed to investigate Officer Haggett's history of misconduct and resulting discipline. Petitioner asserts that, at a minimum, competent defense counsel would have interviewed the complaining parties in the 12 citizen complaints that the prosecution disclosed to the defense, and that effective counsel would have reviewed public documents available at the Police Commission's office to discover the additional, undisclosed complaints and discipline against Haggett.

As to the first *Strickland* prong, petitioner has not shown that defense counsel's performance was deficient. The record shows that trial counsel investigated Haggett's history by filing the *Pitchess* motion to request the production of Haggett's confidential personnel records. According to a declaration filed in connection with petitioner's state habeas proceedings, petitioner's trial counsel hired a private investigator who "believed he attempted to interview some of the persons whose names he received through *Pitchess* discovery . . . [but he] ran into problems with some of these witnesses because the witnesses were not able to distinguish the actions of Officer Haggett from the actions of other police officers that were involved with Officer Haggett during the incidents." Pet. Ex. 8 at 1. While petitioner identifies additional steps that counsel could have taken to investigate Haggett, the Court cannot conclude that trial counsel's performance fell below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88.

As to the second *Strickland* prong, petitioner has not shown prejudice. As discussed *supra*, even if counsel had discovered the additional undisclosed complaints against Haggett, petitioner has not demonstrated how that evidence would have impeached Haggett. Petitioner does not assert that Haggett's trial testimony was false, and petitioner testified at trial that the incident with Haggett occurred.

### 2.     Failure to obtain expert witness

Petitioner next contends that his trial counsel was ineffective in not obtaining an expert witness who could challenge the prosecution's ballistics expert, Sergeant Edward Normandy. At trial, the prosecution presented People's Exhibit 12, a surveillance video taken from a Shell gas station on Linden

11

Avenue. Although the video did not contain any images of petitioner or the officers firing their weapons, the audio track recorded a series of gunshots. 3 RT 646-55, 672-82. Sergeant Normandy listened to Exhibit 12 and testified that he heard seven distinct gunshots, and that the first four and last two gunshots were .40-caliber gunshots. 5 RT 1339. The officers were carrying .40-caliber firearms, while petitioner had a .380-caliber firearm.

Petitioner's claim is without merit because, as respondent notes, defense counsel in fact presented expert testimony challenging Sergeant Normandy's testimony. Two defense experts created Defense Exhibits L-1 and L-2, sound recordings of gunshots using .380-caliber and .40-caliber firearms, and they testified at trial that the gunshots of the two weapons sounded similar and could not be reliably distinguished in an audio recording. *See* RT 2776-2805, 2911-17, 2925-31. Accordingly, neither prong of the *Strickland* standard is met.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is hereby DENIED.

**IT IS SO ORDERED.**

Dated: December 20, 2010

SUSAN ILLSTON
United States District Judge